RECEIVED

APR 1 3 2012

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

PHI, INC.                                          CIVIL ACTION NO. 08-0016

VERSUS                                             JUDGE DOHERTY

OFFICE & PROFESSIONAL EMPLOYEES                    MAGISTRATE JUDGE HILL
INTERNATIONAL UNION, THE
OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION LOCAL 108

## MEMORANDUM RULING

Pending before this Court are two cross motions for summary judgment, as follows: (1)

Motion for Summary Judgment filed by PHI, Inc. ("PHI") [Doc. 71]; and (2) Motion for Summary

Judgment filed by the Office & Professional Employees International Union ("OPEIU") and its Local

Union 108 ("Local 108") (hereinafter referred to collectively as "the Unions") [Doc. 72]. In its

motion, PHI moves for summary judgment on its sole claim against the Unions in the main demand

and on Claim I of the Unions' Counterclaim against PHI. Specifically, PHI argues it is entitled to

judgment as a matter of law as follows:

(1)     The Award of Arbitrator John B. Barnard must be vacated, because the
        Arbitrator failed to comply with the Railway Labor Act and failed to conform
        himself to matters within the scope of his jurisdiction, both as required by
        Section 3, First (q) of the Railway Labor Act, 45 U.S.C. 153, First (q),[1] when

---

[1] 45 U.S.C. §153(q) states:

> If any employee or group of employees, or any carrier, is aggrieved by the
> failure of any division of the Adjustment Board to make an award in a dispute
> referred to it, or is aggrieved by any of the terms of an award or by the failure of
> the division to include certain terms in such award, then such employee or group
> of employees or carrier may file in any United States district court in which a
> petition under paragraph (p) could be filed, a petition for review of the division's
> order. A copy of the petition shall be forthwith transmitted by the clerk of the
> court to the Adjustment Board. The Adjustment Board shall file in the court the
> record of the proceedings on which it based its action. *The court shall have*
> *jurisdiction to affirm the order of the division, or to set it aside, in whole or in*
> *part, or it may remand the proceedings to the division for such further action as*

he (a) gave no effect to an express ten-day time limit on a party's right to seek arbitration, and (b) gave no effect to an express seven-day time limit on a party's right to file a grievance; and

(2)     For the same reasons, Claim I of the Unions counterclaim, which seeks to enforce Arbitrator Barnard's ruling, must be dismissed on the merits.

In their motion, the Unions seeks summary judgment on Count I of its Counterclaim against PHI – which asks for a declaratory judgment as to the rights and obligations of the parties under the arbitration ruling and a preliminary and permanent injunction ordering PHI to arbitrate the merits of the January 5, 2006 Grievance – and on the "claims" raised by PHI in the main demand, dismissing PHI's demands. Both parties have filed responsive briefs [Docs. 74 & 75], and the matter is now ripe for review.

For the following reasons, PHI's motion for summary judgment [Doc. 71] is DENIED, and the Unions' motion for summary judgment [Doc. 72] is GRANTED IN PART AND DENIED IN PART, the motion is granted only to the extent this Court concludes the arbitration ruling at issue should be "upheld," and the January 5, 2006 Grievance returned to the normal arbitration process in light of this Court's ruling.[2]

## I.     Factual and Procedural Background

The following facts are undisputed:

---

*it may direct. On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.* The judgment of the court shall be subject to review as provided in sections 1291 and 1254 of Title 28.

45 U.S.C. §153 (emphasis added).

    [2] Because neither motion addresses Count II of the Unions' counterclaim, this Ruling does not dispose of all claims alleged in this case.

1.    Defendant Office and Professional Employees International Union ("OPEIU") is an unincorporated association and is a "representative" within the meaning of Section 1, Sixth of the RLA, 45 U.S.C. §151, Sixth.

2.    In 2001, the National Mediation Board certified OPEIU to be the collective bargaining representative for the domestic helicopter pilots employed by PHI.

3.    Office and Professional Employees International Union, Local Union No. 108 ("Local 108") is an unincorporated association and is also a "representative" within the meaning of Section 1, Sixth of the RLA, 45 U.S.C. §151, Sixth.

4.    PHI, Inc. ("PHI") is a Louisiana corporation, headquartered in Lafayette, Louisiana, that provides helicopter transportation services to the oil and gas industry in the Gulf of Mexico and Air Medical services throughout the United States. PHI is a "carrier" within the meaning of Section 1, First of the RLA. 45 U.S.C. §151, First.

5.    At times material to this action, OPEIU has delegated to Local 108 certain duties and responsibilities in connection with OPEIU's role as exclusive collective bargaining representative for its membership employed by PHI.

6.    At all times material to this action, PHI and OPEIU have been parties to an existing but expired collective bargaining agreement. ("CBA") establishing the rates of pay, rules, and working conditions of the domestic helicopter pilots employed by PHI.

7.    The CBA addresses the limitations on PHI's right to subcontract out helicopter flying.

8.    The CBA contains certain provisions for the resolution of disputes. Specifically, Articles 36 ("Grievance Procedure") and 37 ("System Board of Adjustment") state the following:

> Article 36 of the CBA states that if a pilot is aggrieved, he shall first attempt to resolve the grievance with his immediate supervisor "within seven (7) calendar days from the date of the occurrences of the event giving rise to the grievance, or within seven (7) calendar days of the date the pilot knew or should have known of such event not to exceed twenty eight (28) calendar days from the date of the event."

> Article 37, Section 5 of the CBA states that, if the Board is deadlocked, "within ten (10) calendar days thereafter either party may request that the American

> Arbitration Association (AAA) submit a list of seven
> potential neutrals, and the neutral shall be selected in
> accordance with the rules of AAA."

9.  Article 37, Section 9 of the CBA also states "[d]ecisions by the Board are final and binding on the Employer, the Union and the affected pilots."

10. On December 14, 2005, OPEIU Senior International Representative and Chief Union Negotiator for Local 108 Paul Bohelski asked whether PHI had hired domestic contract pilots, something the Unions believed PHI did not have the right to do under the parties' existing, but expired, CBA.

11. That same day, December 14, 2005, PHI Chief Administrative Officer Richard Rovinelli confirmed that PHI was hiring eight contract pilots per month to staff its oil and gas operations.

12. On January 5, 2006, Local 108 filed a grievance ("the January 5, 2006 Grievance") complaining that PHI's use of contract pilots violated the parties' CBA.

13. The grievance was denied by the Company, and went to a four-person System Board of Adjustment.  The Board deadlocked on June 15, 2006.

14. Approximately eight months later, in February 2007, Local 108 requested a panel of neutral arbitrators from the Federal Mediation and Conciliation Service.

15. PHI and the Unions agreed to arbitrate the arbitrability of the contract pilot dispute.

16. On June 6, 2007, the Union filed another grievance, complaining again about PHI's use of contract pilots.  Given the pendency of the previous contract-pilot grievance, the parties agreed, on June 15, 2007, to hold the new grievance "in abeyance... until the parties receive Arbitrator Barnard's decision... [at which] time, the parties will revisit the June 6...Grievance in light of Arbitrator Barnard's decision...."

17. Arbitrator John B. Barnard received testimony and exhibits in a hearing and issued a ruling on December 15, 2007 finding in favor of the Unions, i.e., the contract pilot dispute raised in the Unions' January 5, 2006 Grievance was "timely and thus arbitrable."

Thus, based on the foregoing undisputed facts, the instant lawsuit arises out of two

grievances filed by the Unions against PHI, to wit:

4

### January 5, 2006 Grievance

During the December 2005 negotiations, the subject of contract pilots came up "because of rumors" that PHI was hiring contract pilots, which the Unions believed violated the CBA if, in fact, the contact pilots were domestic (and not international) pilots.  The issue was specifically raised during the December 14, 2005 negotiating session; at that time, PHI asserted it was, indeed, hiring domestic contract pilots.   The Unions contend they requested specific information in an attempt to discover whether or not these hirings violated the CBA.  According to the Unions, PHI initially refused to provide any of the requested information, but, at the end of the bargaining session, provided the Unions with a letter concerning the contract pilot issue.  The Unions argue – and PHI does not appear to dispute – this letter did not provide the Unions "with much" of the information they were requesting, including the names of the contract pilots, where they were working, and whether they were domestic or international pilots.

The Unions argue that after the December 14, 2005 negotiating session, Local 108 President Steve Ragin returned to work in his next scheduled shift and continued to investigate the rumors of contract pilot hires, but did not immediately file a grievance, because he remained uncertain about the status of the domestic contract pilot hires.  However, at some point, Mr. Ragin was informed about a specific pilot named Scott Tinnesand, who had been hired by PHI as a domestic contract pilot and who did not intend to fly internationally.  At that point, the Unions believed a verifiable violation of the CBA had occurred, and the Unions filed their contract pilot grievance on January 5, 2006.

The January 5, 2006 grievance – Number 010506-001 – was properly processed through the steps of the Grievance Procedure and was denied at each step by PHI.  The Unions appealed the

denial of the January 5, 2006 grievance to the Joint Systems Board of Adjustment, which deadlocked.  At a meeting on February 22, 2007, the issue of whether a neutral arbitrator had been selected to resolve the January 5, 2006 Grievance was raised.  PHI opposed arbitration, arguing the January 5, 2006 grievance was untimely at that point, because the Unions had not requested a neutral within 10 days of the deadlock.  However, the parties agreed to submit the question of whether the January 5, 2006 grievance was timely – and thus, "arbitrable" -- to Arbitrator John B. Barnard for a binding ruling.  With respect to proceeding in the foregoing manner, the parties have entered into a Stipulation, in which the parties stipulate "issues of procedural arbitrability are for the arbitrator to decide in cases arising out of the National Labor Relations Act ("NLRA"), citing *John Wiley & Sons v. Livingston*, 376 U.S. 543, 555-59 (1964) and *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-85 (2002).[3]

On September 5, 2007, Arbitrator Barnard conducted a hearing on the January 5, 2006

---

[3] The parties further stipulate the following procedural issues arose in connection with the January 5, 2006 grievance and all were brought before Arbitrator Barnard pursuant to a March 29, 2007 agreement between the parties to do so:

- Whether the Unions' failure to process to arbitration a grievance filed in 2005 contesting HI's use of contract pilots constituted a waiver of the Unions' right to file the January 5, 2006 Grievance?

- Whether the January 5, 2006 Grievance was timely filed?

- Whether the Unions' request for a panel of neutrals from FMCS regarding the January 5, 2006 Grievance was timely made?

The parties stipulate that on March 29, 2007, they agreed to bifurcate the procedural issues from the merits of the January 5, 2006 Grievance, thereby agreeing to bypass the System Board of Adjustment on this procedural issue, something the parties had done on occasion in the past.  In doing so, the parties intended to waive any arguable requirement that the timeliness issue first be presented to the System Board of Adjustment.  The parties stipulate their actions were in accordance with applicable law and by agreement of the parties.  *See* "Stipulation Regarding Issue of Procedural Arbitrability," attached as Exhibit "A" to PHI's Motion for Summary Judgment, Doc. 71.

This Court notes the Fifth Circuit case of *Gulf Coast Indus. Workers Union v. Exxon Co.*, USA, 991 F.2d 244, 248 n.3 (5th Cir. 1993), wherein the court remarked, without further consideration, that the parties stipulated the grievance in question was properly before the arbitrator.

Grievance, and on December 15, 2007, issued a ruling in the Unions' favor, concluding the January 5, 2006 grievance was "timely and thus arbitrable."

### June 6, 2007 Grievance

On June 6, 2007, the Unions filed a grievance alleging PHI's continued retention of subcontract pilots violated the terms and conditions of the CBA as to both the method by which PHI subcontracted out helicopter work as well as the time period in which PHI subcontracted out helicopter work.  On June 15, 2007, the Unions and PHI signed a Letter of Understanding agreeing to hold in abeyance the June 6, 2007 grievance until the receipt of Arbitrator Barnard's decision on the January 5, 2006 grievance.

After receipt of Arbitrator's Barnard's December 15, 2007 decision on the January 5, 2006 Grievance, the Unions requested that PHI assign a grievance number to the June 6, 2007 grievance and process the grievance.  On January 4, 2008, PHI refused to process the June 6, 2007 grievance, arguing the grievance is time-barred and not arbitrable.

### The Instant Lawsuit

PHI filed the instant lawsuit on January 3, 2008, seeking to vacate Arbitrator Barnard's December 15, 2007 ruling that the January 5, 2006 Grievance is "timely and thus arbitrable" on grounds the decision is invalid and unenforceable under Section 3, First (q) of the RLA, 45 U.S.C. §153(q), because the decision fails to conform, or confine itself to, matters within the scope of the System Board's jurisdiction.  On January 30, 2008, the Unions answered PHI's complaint, alleging the decision of Arbitrator Barnard is correct and his ruling should be upheld, and asserting the following counterclaims:

> (1)  Count I:  PHI has wrongfully refused to comply with the terms of Arbitrator Barnard's ruling in the Unions' favor by refusing to proceed with an

arbitration on the merits of the January 5, 2006 grievance (Grievance Number 010506-001).   The Unions argue they are entitled to a declaratory judgment establishing their rights and PHI's obligations under the Arbitrator's ruling, as well as a preliminary and permanent injunction ordering PHI to arbitrate the merits of the January 5, 2006 grievance (Grievance Number 010506-001).

(2)   Count II:   By its failure to process the June 6, 2007 grievance through the grievance procedure and by its refusal to arbitrate the June 6, 23007 grievance, PHI has violated the CBA between the parties, as well as Section 204, Title II of the RLA, 45 U.S.C. §184, as amended.   The Unions seeks injunctive relief "in the nature of an order to PHI compelling the assignment of a grievance number to the June 6, 2007 grievance, compelling the processing of the June 6, 2007 grievance through the grievance procedure and System Board procedure, and if the June 6, 2007 grievance is not resolved in the grievance or System Board procedure, ordering arbitration of the June 6, 2007 grievance in accordance with the CBA."

In its motion for summary judgment, PHI moves for summary judgment in its favor on its sole claim against the Unions in the main demand, and against the Unions on Count I of the Unions' counterclaims against PHI.[4] In their motion, the Unions seeks summary judgment in the Union's favor on Count I of the Unions' counterclaims, as well as summary judgment against PHI as to "the claims" raised by PHI in the main demand.   Therefore, the instant motions present cross motions for summary judgment on PHI's claims in the main demand and Count I of the Unions' counterclaims against PHI.   The motions do not address Count II of the Unions' counterclaims against PHI.

## II.   Law and Analysis

### A.   Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or declaratory judgment is sought may, at any time, move with or without supporting affidavits for summary

---

[4] Count II of the Unions' counterclaims is not addressed in either motion for summary judgment filed by the parties.

judgment in the parties favor as to all or any part thereof." Fed. R. Civ. Pro. 56(b). Summary

judgement is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or is otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. Pro. 56(e)

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618

(5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

[. . . .]

> . . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.*

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)(emphasis added)).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Id.* To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as

10

well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

**B.     The Standard for Judicial Review of Adjustment Board/Arbitrator Awards**

The parties agree on the standard to be employed by this Court in reviewing the December 15, 2007 decision of Arbitrator Barnard.   The dispute over PHI's use of contract pilots is a dispute over a grievance that involves the interpretation and application of the CBA between PHI and the Unions.   As such, the dispute concerning PHI's use of contract pilots is classified as a "minor dispute" under the RLA.   *See, e.g., Mitchell v. Cont'l Airlines, Inc.*, 481 F.3d 225, 230-31 (5th Cir. 2007).   Minor disputes must be resolved through compulsory and binding arbitration before the SBA. *Id.* at 231.   *See also BNSF Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 550 F.3d 418, 423 (5th Cir. 2008) (minor disputes involving the interpretation of terms in an existing CBA must be resolved through binding arbitration before the NRAB or another adjustment board), citing *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303-04, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989).   These arbitration remedies "were intended by Congress to be the complete and final means for settling minor disputes." *BNSF*, 550 F.3d at 423, citing *Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.,* 373 U.S. 33, 39, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963); *Union Pac. R.R. Co. v. Sheehan,* 439 U.S. 89, 94, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978) ("Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts. The effectiveness of the Adjustment Board in fulfilling its task depends on the finality of its determinations.").   Accordingly, "the federal courts do not sit as super arbitration tribunals in suits brought to enforce awards of the Adjustment Board. *They may not substitute their judgments for those of the Board divisions.*" (emphasis added)   *Diamond v. Terminal Ry. Ala. State Docks,* 421

F.2d 228, 233 (5th Cir.1970); *see also United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("*Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.*"). (emphasis added)

Consequently, "[j]udicial review of [SBA] decisions arising from the terms of a [CBA] is narrowly limited, and courts should afford great deference to arbitration awards."[5] *Continental Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 555 F.3d 399, 405 (5th Cir. 2009), *citing Resolution Performance Prods., LLC v. Paper Allied Indus. Chem. & Energy Workers Int'l Union, Local 4-1201,* 480 F.3d 760, 764 (5th Cir. 2007) (discussing non-RLA CBAs). The standard for this review is "*among the narrowest known to the law,*" (emphasis added) *E. Air Lines, Inc. v. Transp. Workers Union, Local 533,* 580 F.2d 169, 172 (5th Cir. 1978), and flows from the RLA's "preference for the settlement of disputes in accordance with contractually agreed-upon arbitration procedures." *Andrews v. Louisville & Nashville R.R. Co.,* 406 U.S. 320, 323, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), *cited in Continental Airlines,* 555 F.3d at 405.

The district court should defer to an SBA decision *based on any reasonable ground presented* by the parties, even if not relied upon by the SBA in its decision. *Continental Airlines,* 555 F.3d at 405-06, *citing Resolution Performance,* 480 F.3d at 767 n.20 (emphasis added). Additionally, a court may decline to defer to a decision of the SBA only if (1) the SBA failed to comply with the RLA, (2) there is evidence of fraud or corruption in the SBA, or (3) the order by the SBA did not "confine itself to matters within the scope of [the SBA's] jurisdiction." *Continental*

---

[5] Awards and/or decisions made by the SBA are considered "arbitral awards," therefore, the instant cases are applicable to the grievances discussed in this matter, which went before an arbitrator as contemplated by the SBA grievance process.

*Airlines*, 555 F.3d at 406, *citing Mitchell*, 481 F.3d at 231.  Absent one of those exclusive grounds, or a judicially created exception for public policy concerns,[6] this Court must defer to the arbitrator's decision.

The United States Supreme Court summarized the law applicable to federal court review of labor arbitration awards in *Major League Baseball Player' Ass'n v. Garvey*, stating:

> Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors *or misinterprets the parties' agreement.  We recently reiterated that if an 'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'*  It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense [s] his own brand of industrial justice' that his decision may be unenforceable.  When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, fact finding' does not provide a basis for a reviewing court to refuse to enforce the award.
>
> In discussing the courts' limited role in reviewing the merits of arbitration awards, we have stated that 'courts ... have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.'  When the judiciary does so, 'it usurps a function which ... is entrusted to the arbitration tribunal.'  Consistent with this limited role, we said in *Misco* that '[e]ven in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result.'  That step, we explained, 'would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for' in their agreement.  Instead, the court should 'simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement.'

532 U.S. 504, 509-10 (2001) (*internal citations omitted*)(emphasis added).

> *Thus, in light of this highly deferential standard, the applicable law requires that even where*

---

[6] As with any contract, a court may not enforce a collective bargaining agreement that is contrary to public policy.  *W.R. Grace and Co. v. Local Union 759, et al.*, 461 U.S. 757, 767 (1983).  No party argues the CBA in effect between the parties herein is contrary to public policy.

*a court would have interpreted the contract differently, it must still affirm the award.* So great is the level of deference that a court may not review the merits of an award, but rather, must accept the facts found by the arbitrator and the arbitrator's interpretation of the contract and applicable law. *W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 764 (1983); *Manville Forest Products Corp. v. Paperworkers Union*, 831 F.2d 72, 74 (5th Cir. 1987).   As the Court stated in *W.R. Grace*:

> Under well established standards for the review of labor arbitration awards, *a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one.* When the parties include an arbitration clause in their collective bargaining agreement, they choose to have disputes concerning constructions of the contract resolved by an arbitrator. Unless the arbitral decision does not "dra[w] its essence from the collective bargaining agreement," a court is bound to enforce the award and is not entitled to review the merits of the contract dispute. This remains so even when the basis for the arbitrator's decision may be ambiguous.

461 U.S. at 764 (internal citations omitted)(emphasis added).  Courts have held an award draws its "essence" from the collective bargaining agreement so long as it is "rationally inferable" in "some logical way" from that agreement.  *Manville Forest Products Corp.*, 831 F.2d at 74. (emphasis added)

Thus, in general, a court reviewing an arbitral decision does "not sit to hear claims of factual or legal error as an appellate court does in reviewing decisions of lower courts."   *United Paperworkers Intern Union AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). *The courts are bound to interpret the arbitrator's award and the contract broadly so as to uphold the award.  Manville Forest Products Corp.*, 831 F.2d at 74 (emphasis added).

**1.     PHI's Motion for Summary Judgment [Doc. 71]**

In its motion, PHI does not contend there is evidence of fraud or corruption in the SBA, but argues the arbitrator's decision should be overturned on the first two grounds of 45 U.S.C. §153,

First (q), that is, (1) the arbitrator failed to comply with the RLA, and (2) the arbitrator failed to conform himself to matters within the scope of his jurisdiction.

### a.        The 7-day time limit on a party's right to file a grievance

PHI argues Arbitrator Barnard's ruling must be vacated, because Barnard failed to comply with the RLA when he gave no effect to a seven-day time limit on a party's right to file a grievance.

The specific provision at issue is Article 36 of the CBA, which provides in relevant part:

Article 36, Grievance Procedure

[ . . . . ]

2. Any such grievance shall be processed in the following manner:

Step 1: The Pilot shall first attempt to resolve the grievance with his immediate supervisor within seven (7) calendar days from the date of the occurrences of the event giving rise to the grievance, or within seven (7) calendar days of the date the pilot knew or should have known of such event not to exceed twenty-eight (28) calendar days from the date of the event.  The supervisor shall give his answer within seven (7) calendar days.

Step 2: If the grievance is not resolved at Step 1 to the satisfaction of the grievant, the grievance shall be reduced to writing and presented to the designated representative of the Employer within ten (10) calendar days after the receipt of the immediate supervisor's answer.  The written grievance must state the nature of the grievance, the circumstances out of which it arose, the remedy or correction requested and the specific provisions of the Agreement alleged to have been violated.  The Employer representative will give his answer to the grievance in writing with a copy of the union within ten (1) calendar days after the receipt of the grievance. . . . . [7]

PHI argues the Unions had a "definitive acknowledgment" of PHI's use of contract pilots on December 14, 2005, when, on that date, Mr. Bohelski of the Unions asked Mr. Rovinelli of PHI if PHI was, in fact, hiring eight contract pilots per month and Mr. Rovinelli responded in the affirmative.  At that point, the Unions asked for additional information about the pilots, including

---

[7] *See* "Articles of Agreement between PHI and the Unions" – the CBA between the parties – labeled as Exhibit A-1 in the parties' jointly submitted Arbitral Record, at 000233.

their names, hire dates, work locations and rates of pay, to which PHI responded it did not intend to provide such information.  Based on the foregoing, PHI argues the Unions had actual knowledge of the contract pilot issue on December 14, 2005, and therefore had within seven days of that date  to file a grievance.  PHI argues the Unions failed to do so, and the January 5, 2006 Grievance is, therefore, untimely.[8]

In his ruling, Arbitrator Barnard notes that at the December 14, 2005 bargaining session, the issue of contract pilots was broached.  The arbitrator's ruling contains the following exchange between Paul Bohelski for the Unions and Peter Kiefer, an attorney for PHI, with respect to the issue:

> Mr. Bohelski:   When can I expect to get the information I asked for about contract pilots?
>
> Mr. Kiefer:   We are here to bargain and not get involved in a discovery fishing expedition.  We are not going to provide that.
>
> Mr. Bohelski:   You are saying that we are not allowed to know who is flying our work?[9]

---

[8] In its motion, PHI does not clarify which specific portion of which provision of the CBA it argues is implicated by this argument.  However, the reference to a 7-day time period leads this Court to assume the provision at issue is Article 36(2), Step 1. The Court makes this assumption with some trepidation.  Step 1 of Article 36(2) requires a pilot to "*attempt to* resolve the grievance with his immediate supervisor within seven (7) calendar days from the date of the occurrences of the event giving rise to the grievance, or within seven (7) calendar days of the date *the pilot knew or should have known* of such event not to exceed twenty-eight (28) calendar days from the date of the event."  Article 36(2), Step 1 does not require a pilot to file a grievance within seven days. Rather, a grievance is presented in written form – or "filed" – only after the grievance is not resolved at Step 1 to the satisfaction of the grievant.  At that point, the grievance "shall be reduced to writing and presented to the designated representative of the Employer within ten (10) calendar days after the receipt of the immediate supervisor's answer." Only then is the grievance fleshed out in writing, i.e., the filing must state "the nature of the grievance, the circumstances out of which it arose, the remedy or correction requested and the specific provisions of the Agreement alleged to have been violated." (emphasis added)

The parties refer throughout their briefing to the "filing" of a grievance within seven days.  Presumably, both parties are referring to the 7-day period in Step 1.  Regardless, neither party disputes that the January 5, 2006 grievance was not "filed" within seven days or ten days after the December 14 or 15 bargaining sessions, therefore, this Court assumes it need not consider the issue further.

[9] *See* Arbitrator's Ruling, attached as Exhibit "B" in the parties' jointly submitted Arbitration Record, at 000275.

In his ruling, Arbitrator Barnard asserts:

> Obviously such language leaves wide open the question of contract pilots, a question that arguably should have been provided by the Company.  The Union has the right to know the answers to such questions. (Mandatory subject of bargaining).[10]

Thus, Arbitrator Barnard found the issue of contract pilots was still "wide open" on Decemebr14-15, 2005, and it was not until Mr. Ragin spoke to Scott Tinnesand that he uncovered what Mr. Ragin referred to in his testimony as "the smoking gun."  Arbitrator Barnard notes the Unions then immediately filed their grievance on January 5, 2006.  In making his ruling, Arbitrator Barnard asserts:

> The Company asserts that no grievance was filed within 7 days of the December 15, 2005 bargaining session, thus the January 5, 2006 grievance was untimely.  I disagree, as the meeting on December 15, 2006 [sic] offered no basis for a specific grievance.  The grievance was filed only after Ragin discovered a possible violation with Scott Tinnesand, which occurred after the December 15, 2006 [sic] session.[11]

To this Court, PHI argues the arbitrator imposed an obligation on PHI to engage in discovery that the RLA does not require.  PHI further argues the breach of the CBA alleged by the Unions is that PHI impermissibly hired contract pilots, not that PHI impermissibly hired, for example, contract pilot A on November 5; contract pilot B on November 8; and contract pilot C on November 10.

The law is well-settled this Court, except perhaps in rare exceptions, not involved here, must accept the facts as found by the arbitrator in making his decision, and courts are not authorized to

---

[10] *Id.*

[11] Although the arbitrator correctly referred to the bargaining session as the "December 15, 2005" bargaining session in the first instance, he later twice incorrectly refers to the bargaining session as the "December 15, 2006" bargaining session.

This Court also notes that although the purported conversation between Mr. BOhelski and Mr. Rovinelli concerning PHI's use of contract pilots was supposed to have occurred on December 14, 2005, in his arbitration ruling, the arbitrator referred to the "December 15, 2005" bargaining session.  The parties do not appear to argue that the foregoing discrepancies are material to the timeliness issue before the Court.

reconsider the merits of an award even though the parties may allege the award rests on errors of fact or on misinterpretation of the contract. *Major League Baseball Player' Ass'n v. Garvey*, 532 U.S. at 509-10. In the instant case, after considering the evidence presented by the parties, Arbitrator Barnard made findings of fact, namely, that the issue of contract pilots was "wide open" at the December14-15, 2005 bargaining sessions, said sessions having provided "no basis for a specific grievance," and that it was not until Mr. Ragin spoke to Scott Tinnesand that he learned that PHI was, actually, hiring contract pilots in possible violation of the CBA. Based on these fact findings, Arbitrator Barnard concluded the January 5, 2006 Grievance was filed within seven days of the Unions *discovering a possible violation with Scott Tinnesand.* Although this Court might disagree with Arbitrator Bernard's factual finding and interpretation, this Court does not have the authority to substitute its opinion of the facts for the arbitrator's factual findings, or its opinion for the arbitrator's conclusion when the "arbitrator is even arguably construing or applying the contract and acting within his authority" ... even if this Court were "convinced he [the arbitrator] committed serious error." Thus, Arbitrator Bernard's finding that the January 5, 2006 Grievance was timely, inasmuch as that conclusion is based on the facts as determined by the arbitrator and interpretation of those facts, must stand. Accordingly, this Court must conclude, pursuant to applicable jurisprudence, the arbitrator did not fail to comply with the RLA or fail to conform himself to matters within the scope of his jurisdiction in concluding the Unions' January 5, 2006 Grievance was timely filed, and PHI's contention, although seductive, is not grounded within applicable jurisprudence.

**b.     The 10-day time limit on a party's right to seek arbitration**

PHI, also, argues Arbitrator Barnard's ruling must be vacated, because Barnard failed to

comply with the RLA when he gave no effect to what PHI argues is an express ten-day time limit on a party's right to seek arbitration.  The specific provision at issue is Article 37, Section 5 of the CBA, which states in relevant part:

> ...In the event the Board cannot agree on a neutral member, within ten (10) calendar days thereafter either party may request that the American Arbitration Association (AAA) submit a list of seven potential neutrals, and the neutral shall be selected in accordance with the rules of AAA.[12]

The January 5, 2006 Grievance was denied by PHI and ultimately was presented to a four-person System Board of Adjustment, which deadlocked on June 15, 2006.  PHI makes the same argument to this Court that it made to the arbitrator: The Unions had ten days after the Board deadlocked within which to request the selection of neutral arbitrators for further proceedings.  Because the Unions did not request a panel of neutral arbitrations until February 2007, approximately eight months after the June 15, 2006 deadlock, the Unions' request for a panel of neutral arbitrators was untimely.  In the instant motion, PHI argues Arbitrator Barnard's ruling must be vacated, because the arbitrator's "fundamental misreading" of the CBA caused the arbitrator to "render a plainly irrational decision."  In doing so, PHI argues the arbitrator "exceeded his jurisdiction under the Agreement; he violated the RLA; and he produced an award that must be vacated."  PHI argues:

> There is only one reasonable reading of Section 37: a party may request a list of potential neutrals. Or it may not; it may choose to forego pursuing the matter further. But if a party *does* intend to seek a list of neutrals, it must do so within ten days. Any other reading of Section 5 simply eliminates the ten-day deadline that the parties bargained for. When he eliminated the deadline entirely, the arbitrator was making up a new contract term – one that the parties never agreed to.

Thus, PHI argues the choice to request a panel of neutrals was permissive, but the time period within which to do so was mandatory.  PHI argues the arbitrator's conclusion that the word "may"

---

[12] *See* "Articles of Agreement between PHI and the Unions," labeled as Exhibit A-1 in the parties' jointly submitted Arbitral Record, at 000235.

in Article 37 denotes a "volitional requirement, not a mandatory requirement" is irrational, and in

so ruling, the arbitrator exceeded the scope of his jurisdiction, because he plainly rewrote the terms

of the CBA by reading out the 10-day time limit.

Again, the Court is mindful its review of Arbitrator Barnard's ruling is "among the narrowest

known to the law," *E. Air Lines, Inc. v. Transp. Workers Union, Local 533*, 580 F.2d 169, 172 (5th

Cir. 1978), and flows from the RLA's "preference for the settlement of disputes in accordance with

contractually agreed-upon arbitration procedures." *Andrews v. Louisville & Nashville R.R. Co.*, 406

U.S. 320, 323, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), *cited in Continental Airlines*, 555 F.3d at 405.

This Court, also, notes the provision of the CBA between PHI and the Unions, which states the

decisions of an arbitrator are final and binding on the parties.  Within this very limited prism, the

Court reviews the decision of Arbitrator Barnard.

In his ruling, Arbitrator Barnard observed the past practice of the parties was for the Unions

to request a panel of neutrals within 10 days of a Board deadlock if the Unions wanted to take a

matter to arbitration.  However, Arbitrator Barnard noted in this particular case, PHI admitted the

Unions were not advised that no neutral had been selected during the June 2006 Board meeting, as

had occurred in the past at every other Board meeting since the inception of the CBA between the

parties.  Arbitrator Barnard noted the absence of such comments "was reasonable since the parties

were continuing to discuss the contract pilot issue during the negotiations."[13]  Thus, the arbitrator

considered the past practice of the parties in attempting to interpret the CBA, but the past practice

of the parties was not particularly helpful in this case, as the parties did not follow their past practices

in this particular instance.

---

[13] *See* Arbitrator's Ruling, attached as Exhibit "B" in the parties' jointly submitted Arbitration Record, at 000281.

Arbitrator Barnard then focused his attention on the express language of the CBA itself, stating "[t]he language [of Article 37] itself provides that in the event the Board cannot agree on a neutral member, within 10 calendar days thereafter, either party may request that the AAA submit a list of neutrals. **Section 5 provides a volitional requirement, not a mandatory requirement.**"[14] In so concluding, Arbitrator Barnard noted a "subtle difference" in the wording of Article 37 and Article 36 of the CBA addressing grievances, explaining Article 36 "uses the term shall in advancing a grievance through the various steps," but under Article 37, "the word shall is omitted and the word may is contained in requesting a neutral."[15] Arbitrator Barnard also noted Article 36, Section 5 states, "Any grievance not presented and processed in the manner, and within the time limits set forth above (the grievance procedure) shall be waived....." but that there is no such wording contained in Article 37.[16]

Arbitrator Barnard noted his conclusion that the word "may" in Article 37 is permissive rather than mandatory is consistent with the understanding of both Paul Bohelski, Chief Negotiator for the Unions, and Richard Rovinelli, Director of Human Resources for PHI. Specifically, during Arbitrator Barnard's hearing on the issue of whether the Unions' failure to request a panel of neutrals within 10 days was an arbitrable issue, Mr. Bohelski testified:

---

[14] Arbitrator's Ruling at 000281 (emphasis added). Arbitrator Barnard also pointed out the definition of "may" in the Webster's New Collegiate Dictionary (1979) as "having the ability to," and "having permission to."

[15] *See* Arbitrator's Ruling, attached as Exhibit "B" in the parties' jointly submitted Arbitration Record, at 000282.

[16] *Id.* Article 36, Section 5 states in relevant part:

> 5. Any grievance not presented and processed in the manner, and within the time limits set forth above (the grievance procedure) shall be waived.....

As the arbitrator noted, the word "shall" does not appear in Article 37.

Q:              Is it the Unions' position that there is no time limit on taking the
                matter to – seeking a panel?

Mr. Bohelski:  That's correct.[17]

Additionally, Mr. Rovinelli testified:

Q:              All right.   If the contract says "may," does that mean that the
                profession [sic, provision] is discretionary?

Mr. Rovinelli: Yes.[18]

Considering the foregoing, Arbitrator Barnard ruled as follows:

The word <u>may</u> as contained in Article 37 does not mandate that a panel of neutrals
is to be requested within ten (10) calendar days.

As discussed, the pending grievance in this case is timely and thus arbitrable.[19]

The law is clear that "as long as the arbitrator is even arguably construing or applying the

contract[s] and acting within the scope of his authority, that a court is convinced he committed

serious error does not suffice to overturn his decision.'  The SBA "may look beyond the written

contract when interpreting a collective bargaining agreement if the instrument is ambiguous or silent

upon a precise question." *Continental Airlines, Inc. v. Air Line Pilots Ass'n, Intern.*, 555 F.3d 399,

406-07 (5th Cir. 2009).

In the instant case, Arbitrator Barnard considered the precise arguments before the Court

today, that is, the interpretation of the word "may" in Article 37 of the CBA.  In interpreting Article

---

[17] *See* Arbitrator's Ruling, Exhibit B, at 000281.

[18] *See* Arbitrator's Ruling, Exhibit B, at 000283.

In its motion, PHI argues Mr. Rovinelli's response to the question sheds no light on the ultimate issue, as
the question itself is unclear because it does not distinguish "between requesting a neutral and the party's discretion
not to advance the grievance to arbitration but to abandon its position."

[19] *Id.* at 000283.

37, the arbitrator considered the express language of Article 37 and compared it to other language existing within the CBA, specifically, the language contained within Article 36,[20] as well as the common usage of the word "may" contained within a dictionary. Thus, Arbitrator Barnard "settled the dispute between the parties with respect to the interpretation or application of a labor agreement by interpreting the express language of the contract;" in other words, Arbitrator Barnard did not dispense with the language of the CBA and dispense his own "notions of industrial justice." Rather, Arbitrator Barnard compared and contrasted the language of two provisions of the CBA – Articles 36 and 37 – in interpreting the language at issue. Based on his interpretation of the language contained within the foregoing sections of the CBA, and well as the accepted and common usage of the word "may," Arbitrator Barnard concluded a failure to comply with any time limit in Article 37 does not result in waiver of the right to request a panel of neutrals. In so finding, the arbitrator concluded the January 5, 2006 Grievance is timely.

Under established law, even if this Court were convinced Arbitrator Barnard committed serious error in making this determination – which this Court does not, nor need it, address – such error would not be sufficient to overturn his decision. As the Supreme Court stated in *United Steelworkers of American v. Enterprise Wheel & Car. Corp.*, 363 U.S. 593, 589, 80 S.Ct. 1358, 1362 (1960):

---

[20] This Court notes Article 36 requires the following:

1. a pilot "shall" attempt to resolve a grievance with his supervisor within seven calendar days of the occurrence, and the supervisor "shall" give an answer within another seven calendar days;

2. a pilot "shall" reduce the grievance to writing and present the grievance to the employer within ten calendar days;

3. the employer representative "will" give his answer in writing within ten calendar days;

4. the employer's representative "shall" render a decision within fourteen calendar days.

> The collective bargaining agreement could have provided that if any of the employees were wrongfully discharged, the remedy would be reinstatement and back pay up to the date they were returned to work. Respondent's major argument seems to be that by applying correct principles of law to the interpretation of the collective bargaining agreement it can be determined that the agreement did not so provide, and that therefore the arbitrator's decision was not based upon the contract. The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract. This plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. This underlines the fundamental error which we have alluded to in United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343. As we there emphasized, the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

Thus, this Court may only vacate the ruling of Arbitrator Barnard if it concludes the arbitrator's ruling is not "rationally inferable" in "some logical way" from the CBA. Again, even if the Court were to disagree with the arbitrator, this Court cannot substitute its judgment for the arbitrator's. Thus, the Court cannot conclude PHI's argument must prevail, in this case. Here, Arbitrator Barnard properly considered the language of the CBA as well as the common usage of terms within the CBA, and his interpretation of the language contained within Article 37 cannot be said not to be "rationally inferable" in "any logical way" from the CBA. Cognizant that "[j]udicial review of [SBA] decisions arising from the terms of a [CBA] is narrowly limited," that "courts should afford great deference to arbitration awards," and that the standard of review employed by this Court in considering the decision of Arbitrator Barnard is "among the narrowest known to the law," this Court must conclude it has no authority to vacate the arbitrator's decision that the January 5, 2006 is "timely and thus arbitrable."

Considering the foregoing, it is ORDERED that PHI's motion for summary judgment [Doc.

71] is DENIED in its entirety.

### 2.     The Unions' Motion for Partial Summary Judgment [Doc. 72]

In their motion, the Unions seek judgment "on [their] Counterclaim, Count I, and on the claims raised by Plaintiff, PHI, Inc." on grounds the arbitral ruling of John Barnard should be enforced by this Court.

In Count I of their Counterclaim, the Unions seek the following relief:

#### XIV.

PHI has wrongfully refused to comply with the terms of the [arbitration] Award by refusing to proceed with an arbitration on the merits of Grievance Number 010506-001 [the January 5, 2006 grievance].

#### XV.

The Unions are entitled to a declaratory judgment **establishing [their] rights and PHI's obligations under the Arbitrator's award**.

#### XVI.

The Unions are entitled to a **preliminary and permanent injunction ordering that PHI arbitrate the merits of Grievance Number 010506-001** [the January 5, 2006 grievance].[21]  (emphasis added)

The parties do not dispute the Unions' argument that this Court possesses the jurisdiction to issue the relief requested by the Unions, either in the form of a declaratory judgment or preliminary and/or permanent injunctive relief.  Furthermore, the Unions' position is consistent with applicable jurisprudence.  *See, e.g., New Orleans Steamship Ass'n v. General Longshore Workers, I.L.A., Local Union #1418*, 389 F.2d 369, 371 (5th Cir. 1968) (". . . . it has become commonplace for federal courts to enforce arbitration awards by mandatory injunction where matters other than strikes, work stoppages of [sic] picketing are involved[;]" "[o]nce arbitration [is] completed, the matter "becomes"

---

[21] *See* Unions Answer and Counterclaims, Doc. 5.

ripe for specific performance and [falls] outside the scope of Norris-LaGuardia."), *citing Minute Maid Co. v. Citrus, Cannery, Food Processing and Allied Workers, Drives, Warehouseman and Helpers, Local Union #444*, 331 F.2d 280, 281 (5th Cir. 1964); *Fountainbleau Hotel Corp. v. Hotel Employees' Union Local 255*, 328 F.2d 310 (5th Cir. 1964).

Under the unique facts of this case, however, i.e. where the parties, by stipulation, agreed to submit an individual threshold question(s) to the arbitrator, here primarily, whether the matter was/is arbitrable,[22] and when, for the reasons noted above, this Court has concluded under the legal standards for a district court's consideration of a labor arbitration award, that this Court does not have the authority to vacate Arbitrator Barnard's December 15, 2007 Award in favor of the Unions, which held that the Unions' January 5, 2006 Grievance with respect to PHI's hiring of contract pilots is "timely and thus arbitrable," a different result might be demanded. Specifically, in respect to the *specific relief* requested by the Unions, this Court has concern the Union over-reaches. In its request for relief, the Unions seek an injunction "ordering that PHI arbitrate the merits of [the January 5, 2006 Grievance]," not that the arbitrator's ruling *that the claim is arbitrable* be validated and upheld.

While this Court has concluded it has no grounds to vacate the arbitration ruling, neither have the Unions carried their burden to show that they are entitled to *an injunction **ordering PHI to arbitrate the merits of the grievance***. While the foregoing may well be the next step in the process, this case involves a unique situation wherein the arbitrator **did not rule on the *merits* of any particular grievance**, or order one or the other party to engage in the arbitration process, rather than, for instance, choose to settle or resolve the matter in some other fashion, rather, the arbitration

---

[22] Again, as previously discussed in this ruling, the parties "agreed in writing to bifurcate the procedural issues" – i.e., whether the Unions' failure to process to arbitration a grievance filed in 2005 contesting PHI's use of contract pilots constituted a waiver of the Unions' right to file the January 5, 2006 Grievance; whether the January 5, 2006 Grievance was timely filed, and whether the Unions' request for a panel of neutrals regarding the January 5, 2006 Grievance was timely made – from the merits of the January 5, 2006 Grievance.

considered and ruled on two *procedural, threshold issues* which had been raised as bars to the arbitration process.  Therefore, **the arbitrator did not grant any substantive relief with respect to the January 5, 2006 Grievance**.  Thus, the only relief for this Court to "uphold" under these circumstances is to affirm the arbitrator's ruling that the January 5, 2006 Grievance was "timely and thus arbitrable" and allow the parties to return to the normal course of negotiation and perhaps arbitration as laid out by Congress.  While the next step in the process may well be to arbitrate the merits of the grievance, neither party has precisely indicated when or how the SBA process might work in this unique factual situation and whether arbitration itself, is or might be mandatory or permissive, and, thus, this Court will not herein substitute itself for the operation of that process, whatever it might be, by ordering PHI to do something outside and beyond the very narrow threshold and procedural issues submitted to and decided by the arbitrator.  What the next procedural step might be in a situation such as this is a matter for the CBA and arbitration process to define - not this Court.  Considering the foregoing, the Unions's motion is GRANTED only to the extent this Court "upholds" Arbitrator Barnard's December 15, 2007 ruling that the January 5, 2006 Grievance is "timely and thus arbitrable," and DENIED as to the broad relief requested by the Unions, and this Court returns this matter to the parties to continue toward resolution by those processes delineated by the CBA and the existing congressional procedures, to proceed toward full resolution in that manner or manners.

## III.    Conclusion

Considering the foregoing, this Court concludes it has no authority to vacate the arbitrator's December 15, 2007 ruling that the Unions' January 5, 2006 grievance was "timely and thus arbitrable."  Considering the foregoing, PHI's Motion for Summary Judgment [Doc. 71] is DENIED in its entirety, however, this Court finds the Unions overreach as to the relief requested, thus, the

Unions' Motion for Summary Judgment [Doc. 72] is GRANTED in part and DENIED in part.  It is

GRANTED to the extent this Court "upholds" Arbitrator Barnard's December 15, 2007 ruling that

the January 5, 2006 Grievance is "timely and thus arbitrable," and DENIED as to the broad relief

sought, and this Court returns this matter to the enumerated resolution processes to proceed in a

manner that is consistent with this finding.

     THUS DONE AND SIGNED in Lafayette, Louisiana, this _13_ day of April, 2012.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE